IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 2 9 2005

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

SOUTHPRINT , INC.,  )
d/b/a CHECKERED FLAG SPORTS,  )
    Plaintiff,  )
      )
v.  )    Case No. 4:02-CV-00038
      )
H3, INC.,  )  By:  Hon. Michael F. Urbanski
    Defendant.  )    United States Magistrate Judge

## REPORT AND RECOMMENDATION

This matter is before the court on defendant H3, Inc.'s ("H3") motion for summary

judgment and plaintiff Southprint, Inc.'s ("Southprint") motion for partial summary judgment.

This matter is before the undersigned by designation of the district court for report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

In its complaint, Southprint alleges a plot by one of its competitors in the screen printed

apparel business, H3, to interfere with its business relations with one of its suppliers, DADA, and

two of its customers, AutoZone and CSK.  Having reviewed the record and applicable case law,

it is the recommendation of the undersigned that H3's motion for summary judgment be granted

and this case be dismissed.

Southprint's first claim is that H3 improperly interfered with its relationship with a

mutual supplier located in Korea, DADA, by demanding that DADA supply H3 exclusively.

Southprint contends that by this demand, H3 improperly attempted to cut off Southprint's source

of supply.  On its face, however, there is nothing inherently unlawful about an exclusive supply

relationship.[1]  Indeed, in this case, H3 claims that the exclusive supply arrangement with DADA

---

[1]Under certain circumstances, exclusive supplier relationships may run afoul of the
antitrust laws, but there is no such claim in this case.

was necessary because of its concern that certain proprietary business information was being funneled through DADA to its competitors.

Regardless of the motivation for the H3 – DADA exclusive supply contract, the undisputed evidence shows that Southprint's supply relationship was not terminated after H3's demand. Rather, Southprint's source of supply simply went underground, and Southprint continued to be supplied by an entity affiliated with DADA's principals.

Regarding the alleged interference with Southprint's two customers, AutoZone and CSK, it is likewise recommended that H3's motion for summary judgment be granted. The deposition testimony of the two customers clearly indicates that the issues raised by H3's salesmen about Southprint were typical of concerns raised by competitors and did not affect their business with Southprint. Indeed, despite the alleged interference, Southprint retained both customers. Thus, whether couched as tortious interference, defamation or a Lanham Act violation, there is no causation flowing from H3's alleged conduct. Finally, the fact that the recipients of the alleged defamatory statements took them with a "grain of salt" and considered them to be typical concerns raised by competitors compels the conclusion that such statements cannot be defamatory per se.

## I. FACTUAL ALLEGATIONS

### A.    The Parties and Other Actors.

Southprint is a Virginia corporation with its principal place of business in Martinsville, Virginia. Southprint does business as Checkered Flag Sports ("CFS"). Southprint is a manufacturer and distributor of screen-printed and embroidered apparel, and, among other things, sells hats and t-shirts to large automotive parts retailers such as AutoZone, and Checker Shucks

2

and Kragen ("CSK"). Southprint holds licensing agreements with Ford, Chevy, and Dodge, among others. Burgess ("Butch") Hamlet is President and Chief Executive Officer of Southprint.

Defendant H3, Inc. ("H3"), an Indiana corporation, does business as H3 Sportsgear and is a direct competitor of Southprint. Scott Hines is an officer of H3. Michael McGee ("McGhee") formerly served as Vice President of New Business Development for H3 and represented H3 to customers and prospective customers.

DADA Corp. ("DADA") of Seoul, South Korea, is a large manufacturing/trading company dealing in embroidered materials. In May, 2002, Stephen Park was President of DADA. DADA began manufacturing headwear for both H3 and Southprint in the mid-1990s. H3's volume of business with DADA was approximately five times that of Southprint. DADA continues to do business with H3, but discontinued its business relationship with Southprint in May, 2002 following a demand by H3 that DADA supply it exclusively.

Trademax International, Ltd. ("Trademax") of Hong Kong, China, is a manufacturing/trading company of embroidered materials affiliated with the principals of DADA. Trademax began manufacturing headwear for Southprint after DADA ceased supplying Southprint.

ProWear Enterprises, Inc. ("ProWear"), is a wholesale distributor/broker of headwear. Raul Alvarez is the President of ProWear. ProWear served as Southprint's broker for headwear manufactured by DADA until DADA discontinued its relationship with Southprint. ProWear now serves as Southprint's broker for headwear manufactured by Trademax.

AutoZone is a large automotive parts retailer based in Memphis, Tennessee. The following persons are employed by AutoZone: William Edwards (Vice President of Merchandising); William Hull (Senior Product Manager); and Marilyn Hurst (Product Manager).

3

Checker Shrucks and Kragen ("CSK") is a large automotive parts retailer based in Phoenix, Arizona. Barbara Tolbert is employed by CSK with responsibility for purchasing.

Marym Industries ("Marym") is a manufacturer's sales representative agency based in Kansas City, Missouri. Nathan Ferman is the President of Marym. Marym serves as Southprint's sales representative for most automotive accounts, including AutoZone and CSK. (Ferman Dep. at 23-24)

TASCO Inc. ("TASCO") is a manufacturer's sales representative agency with a principal place of business in Memphis, Tennessee. TASCO served as sales rep for Marym working on the AutoZone Ford, Chevy and Dodge headwear program. (Hammett Dep. at 25, 36) TASCO has a number of sales people, including Todd Hammett, who specialize in representing a class of vendors to AutoZone.

Following oral argument, counsel for Southprint submitted the deposition testimony of Edwards, Hull and Hurst of AutoZone, Tolbert of CSK, McGhee and Hines of H3, Ferman of Marym, Alvarez of ProWear, Hammett of TASCO, which the undersigned has studied in connection with the summary judgment motions.

### B.    Allegations Contained in the Complaint

In early to mid-2001, AutoZone began considering selling headwear and t-shirts bearing designs licensed by Ford, Chevy, and Dodge. Both Southprint (acting through Marym and TASCO) and H3 approached AutoZone and expressed an interest in supplying merchandise for the program. Throughout early 2002, both Southprint and H3 engaged in negotiations with AutoZone and participated in test programs where each company's respective Ford, Chevy, and Dodge apparel was placed in selected AutoZone stores. It is important to understand that

4

Southprint was not directly involved with AutoZone and CSK on the Ford, Chevy, Dodge test program. Instead, the buyer at AutoZone, for example, communicated directly with Hammett of TASCO and Ferman of Marym. Indeed, neither the April 18, 2005 and May 30, 2005 quotes to AutoZone referred to Southprint. Rather, each quote reflected that the transaction would be with Marym Industries for Checkered Flag Sports Products. (See Ex. 9 and 10 to Hammett Dep.) DADA manufactured the headwear for both Southprint and H3 for the test programs.

Southprint contends that it obtained a business expectancy on May 10, 2002 when AutoZone orally notified Marym that Marym had been selected as the vendor for the chain-wide Ford, Chevy, and Dodge program based on the terms and conditions included in Marym's quote dated April 18, 2002. (Hammett Dep. Ex. 10) At that time, however, AutoZone did not issue any purchase order or other written confirmation of Marym's April 18, 2005 quotation. (Hammett Dep. at 97, 163-64) Rather, the business expectancy on which Southprint pins its case is reflected in a telephone call from Marilyn Hurst, the AutoZone buyer, to Todd Hammett, the TASCO sales rep, on Friday afternoon, May 10, 2005, in which Hurst stated to Hammett that "we were going to get the business." (Hammett Dep. at 41) Hammett testified at deposition that he did not consider the Hurst phone call to be a commitment from AutoZone, (Hammett Dep. at 116, 176-77),[2] although he did not "anticipate after her telling me that we had the business that we didn't have the business." (Hammett Dep. at 177) Nathan Ferman of Marym, working with Hammett

---

[2] Hammett testified that "[y]ou don't have anything until you have a purchase order, but we were told, you got the business." (Hammett Dep. at 116)

on the proposal, testified that they had a "handshake deal with AutoZone,"[3] (Ferman Dep. at 116-17), until questions were raised by H3. (Ferman Dep. at 120-21, 155-56)  Southprint alleges that after Hurst's May 10 call, Michael McGhee, acting for H3, made several misrepresentations concerning Southprint's ability to fulfill the chain-wide program causing AutoZone to rebid the program.  Even though Southprint eventually ended up securing the AutoZone business following subsequent bidding, Southprint alleges that it did so on less favorable terms and conditions resulting in damages of approximately $400,000.[4]  Southprint also alleges that similar statements were made during June, 2002, to another customer, CSK, but Southprint received the CSK business on the same terms.  Barbara Tolbert, purchasing agent for CSK, testified that H3's questions about Southprint's capabilities were typical and did not affect its business.  (Tolbert Dep. at 58, 60-61, 81-84)

After learning of AutoZone's initial decision late on May 10, Southprint issued two purchase orders to DADA for the production of certain NASCAR hats the next week.  Plaintiff alleges that H3 interfered with this contract by demanding, at the risk of losing H3's business, that DADA stop producing hats for Southprint.  H3 responds to these allegations by asserting that its demand took place well before May 10, and was motivated by concerns that DADA was disclosing H3's proprietary designs.  Finally, H3 asserts that there can be no tortious interference

---

[3]Ferman of Marym confirmed that as of May 21, 2002, AutoZone had not issued any purchase order confirming the "handshake" deal regarding the Ford, Chevy and Dodge hat program. (Ferman Dep. at 124)

[4]To a substantial degree, these estimated damages reflect a $0.19 reduction in the per unit price for hats and T-shirts sold to AutoZone (from $4.92 per unit to $4.73) based on negotiations which took place between May 10, 2005 and May 30, 2005.  (Ex. 9 and 10 to Hammett Dep.)

6

claim because Southprint's supply relationship continued surreptitiously through persons and entities associated with DADA.

Based on these contentions, Southprint filed a four-count Complaint alleging violations of the Lanham Act (Count I), business defamation (Count II), intentional interference with Southprint's contracts with DADA (Count III), and tortious interference with Southprint's business expectancy (Count IV).

### C. H3's Motion for Summary Judgment

On January 10, 2005, H3 filed a motion for summary judgment regarding all of Southprint's claims. Three of Southprint's claims (Counts I, II, and IV) stem from the same set of factual allegations, namely that H3 approached two of Southprint's customers, AutoZone and CSK, and made false statements about Southprint in an effort to steer these customers to H3. Southprint contends that Michael McGhee, H3's sales agent, falsely "advised AutoZone that [plaintiff] is financially unstable, has no production capability, [that plaintiff] only has one factory to produce hats and that [plaintiff] had lost that factory" and that McGhee told Marylin Hurst, the buyer at AutoZone, that he "knew for a fact that they [Southprint] do not have a Ford, Chevy and Dodge License." (Compl. ¶¶ 17-18)

The problem with Southprint's case, however, is that the evidence does not support its allegations of tortious interference, defamation and trade disparagement. While Southprint's complaint, for example, alleges that certain disparaging statements were made by H3's Michael McGhee concerning Southprint's source of supply, financing and license status, the alleged recipients of these statements categorically deny that they were made in the manner alleged. For instance, Marilyn Hurst of AutoZone flatly denies that McGhee made any of the alleged

7

defamatory statements to her. (Hurst Dep. at 43-45, 47, 53-54) Careful review of the testimony reveals that McGhee, upset by the fact that H3 was not going to get the AutoZone business, questioned AutoZone executives Edwards and Hull over the weekend of May 10, 2002 about the winning bidder's capabilities and challenged Auto Zone to make sure that the winner had adequate supply, credit and licenses to meet its needs. (Edwards Dep. at 31-34, 57, 59-60; Hull Dep. at 14-16, 28-30, 36-37) Raising such competitive issues is a far cry from tortious interference, defamation and a violation of the Lanham Act, and there are no facts to support a jury issue on these claims.

Further, it is undisputed that Southprint did not lose the AutoZone and CSK contracts as a result of the alleged statements. The buyers at AutoZone and CSK indicated that issues regarding another competitor's capabilities were common in the industry and did not affect their business with Southprint. (Edwards Dep. at 36-37, 88-89; Hull Dep. at 14, 46, 77; Tolbert Dep. at 58, 60-61, 81-84)

Southprint counters by noting that while that may be true as regards CSK, the statements made by McGhee were made after it obtained a business expectancy when it was orally advised that it had obtained the AutoZone business on Friday, May 10, 2002. Southprint contends that McGhee's comments prompted AutoZone to conduct further negotiations resulting in a less favorable deal with AutoZone. After addressing concerns about supply, licensure and financial condition, Marym submitted a revised bid to AutoZone on May 30, 2002, which was accepted by Autozone. Southprint claims a business expectancy from the May 10 oral notification by AutoZone, with which H3 interfered by means of the McGhee calls over the weekend of May 10. Again, the problem with Southprint's theory is that it is contradicted by the evidence from the

8

AutoZone executives who testified that the post-May 10 negotiations were motivated by its desire to wring the best deal out of the two bidders and did not stem from anything McGhee said. (Edwards Dep. at 78-83; Hull Dep. at 77)  As such, there is no actionable claim regarding either CSK or AutoZone.

Additionally, H3 contends that Southprint's remaining count, that H3 has tortiously interfered with Southprint's relationship with its supplier, DADA, is similarly without merit because (a) H3's actions were, in fact, legal; and (b) because Southprint's supply relationship never actually terminated, but instead moved under another shell.

## II. STANDARD OF REVIEW

Summary judgment should be granted only if, viewing the record as a whole in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F,2d 604, 610 (4th Cir. 1985).  In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party."  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted).  Where the movant has made out a prima facie case that would entitle it to summary judgment, the non-moving party bears the burden of presenting evidence showing that there is a genuine issue of material fact.  The party must demonstrate specific facts, as opposed to general allegations, that present an issue worthy of trial.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 556-57 (1992).

9

## III. H3'S ALLEGED INTERFERENCE WITH SOUTHPRINT'S SUPPLIER

H3 contends that Southprint's claim in Count III that H3 tortiously interfered with Southprint's manufacturing contract with DADA fails for two primary reasons. First, H3 argues that Southprint cannot show that H3 used improper means to interfere with the purported contract; and, second, H3 argues that Southprint's supply relationship was not, in fact, terminated as Southprint continued to be supplied through entities affiliated with DADA.

### A. There is Nothing Tortious About H3's Exclusive Manufacturing Contract with DADA.

Under Virginia law, the requisite elements for a prima facia showing of tortious interference with a contract not terminable at will are as follows:

  (1)   the existence of a valid contractual relationship or business relationship expectancy;

  (2)   knowledge of the relationship or the expectancy on the part of the interferor;

  (3)   intentional interference inducing or causing a breach or termination of the relationship or the expectancy;

  (4)   resultant damage to the party whose relationship or expectancy has been disrupted.

Chaves v. Johnson, 230 Va. 12, 120, 335 S.E.2d at 102 (1985); Duggin v. Adams, 234 Va. 221, 226, 360 S.E.2d 832, 835 (1987). Southprint contends in this case that H3 tortiously interfered with its relationship with DADA by requiring DADA to enter into an exclusive supply agreement. At the outset, there is nothing inherently tortious or unlawful about an exclusive supply agreement. See, e.g., Geneva Pharmaceuticals Tech. Corp. v. Apothecon, Inc., 386 F.3d 485, 491 (2d Cir. 2004) (stating that exclusive supply arrangements can be legal); Manufacturer's Direct Hearing Aid Ctrs. v. Starkey, 1998 U.S. Dist. LEXIS 1484, at **14-15 (construing

Case 4:02-cv-00038-NKM-mfu   Document 94   Filed 07/29/05   Page 10 of 31   Pageid#: 536

provisions of an exclusive supply arrangement). Southprint itself acknowledged that it had an exclusive merchandising arrangement with Roush Racing. (Alvarez Dep. at 38) Indeed, H3 states that this agreement was necessary to protect its proprietary designs. For its part, Southprint asserts that the timing of H3's exclusive supply demand shows that its motive was to undermine Southprint's ability to successfully bid on the AutoZone and CSK business.

It is important to understand the precise relationship Southprint asserts it had with DADA. There is no evidence that Southprint had a formal contractual relationship with DADA with which H3's demand for an exclusive supply agreement interfered. Indeed, there was no binding contract obligating DADA to supply Southprint on an ongoing basis. The legal underpinnings of Southprint's relationship with DADA are reflected in individual sales transactions represented by separate purchase orders and invoices.

As such, there was no contract for a definite term between DADA and Southprint.[5] Under such circumstances, a claim of tortious interference contains an additional element of proving that the interference was accomplished by improper means. This is because

---

[5]Southprint contends that it is not required to show improper means on the part of H3 because it had placed two purchase orders on May 14 and 15, 2002 with DADA at the time of H3's alleged interference. As to these two orders, however, Southprint fails to provide any evidence that H3 knew of these orders and intentionally interfered with them. Assuming that these purchase orders constitute binding contracts for a definite term such that Southprint may avoid the requirement of proving improper means, Southprint has not shown any knowledge by H3 of these binding obligations. Further, Raul Alvarez of ProWear, Southprint's hat broker, testified that even after May 21, 2005, DADA finished making hats that were already purchased. (Alvarez Dep. at 50) When making its demand that DADA serve H3 exclusively, H3 likewise assumed that DADA would continue orders that were in process. (Hines Dep. at 60) Thus, Southprint's evidence fails to meet the elements of actionable tortious interference with these specific purchase orders.

11

"unlike a party to a contract for a definite term, . . . an individual's interest in a contract terminable at will is essentially only an expectancy of future economic gain, and he has no legal assurance that he will realize the expected gain." Duggin, 234 Va. at 226, 360 S.E.2d at 836 (citing Restatement (Second) of Torts § 776 cmt. (g) (1979)). "Consequently, when a contract is *terminable at will*, a plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the H3 employed '*improper* methods.'" Duggin, 234 Va. at 226-27, 360 S.E.2d at 836 (emphasis in original). In Duggin, the Virginia Supreme Court defined "improper means" to:

> include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of confidential information, or breach of a fiduciary relationship.

234 Va. 221, 227, 360 S.E.2d 832, 836 (1987).

This case presents no genuine issue of material fact as to the issue of improper means as this case does not involve any actions by H3 which Virginia courts have deemed improper. Viewed in the light most favorable to Southprint, H3 demanded that DADA enter into an exclusive supply relationship with it or risk losing H3's business. (Hines Dep. at 60-61) Under the facts of this case, such a demand does not rise to the level of tortious interference, much less improper methods of doing so.

In a declaration in support of H3's motion for summary judgment, Scott Hines, President of H3, states that:

> [b]efore April 2002, both Plaintiff and H3 had hats manufactured for them by DADA. The hats manufactured for H3 by DADA were exclusive designs that belonged to H3. Among the customers

> for whom H3 produced exclusive designs was Roush Racing . . . .
> When H3 learned that plaintiff had quoted H3's designs to Roush at
> a lower price than H3 was charging, H3 was naturally upset that
> DADA had shared H3's proprietary information with H3's
> competitors. In an effort to protect its exclusive designs and
> proprietary information, and to ensure a consistent source of hats,
> H3 determined that it needed to have an exclusive manufacturing
> agreement with some manufacturer. Because H3 had been using
> DADA, H3 approached DADA in April 2002 and inquired if
> DADA would be willing to enter into an exclusive manufacturing
> agreement.

(Hines Decl. ¶¶ 3-4.) H3's claimed rationale for its demand of exclusivity is corroborated by

several contemporaneous e-mails. These documents reflect that in March, 2002, ProWear,

Southprint's agent for overseas manufacturing, approached DADA and requested information on

the prices that DADA was charging for certain H3 designs. See (Def.'s Mem. Supp. Mot.

Summ. J., Exh. 3, Mar. 23, 2002 e-mail, ¶ 12.) DADA supplied this business information to

ProWear, which then used the information to quote lower prices to customers on these H3

designs. (Id., Exh. 4, March 26, 2002 e-mail) (stating "I think you should emphasize that these

caps will be identical to what H3 had already delivered and as such no new samples need to be

developed or copied."); (Id., Exh. 5, March 25, 2002 e-mail from ProWear to Southprint)

(discussing need to base quote on H3's prices).

Southprint, citing Flash Electronics, Inc. v. Universal Music & Video Distribution Corp.,

312 F. Supp. 2d 379, 404 (E.D.N.Y. 2004), counters that H3 put "economic pressure" on DADA

in the form of its continued business, and that this "pressure" can constitute improper means.

Flash Electronics hardly supports Southprint's position. Indeed, the court in Flash Electronics

noted that business competitors may be excused from tortious interference "so long as the

'interference is intended at least in part to advance the competing interest of the interferor.'" Id.

13

at 404 (citing <u>Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.</u>, 50 N.Y.2d 183, 191 (1980). More to the point, the court in <u>Flash Electronics</u> expressly rejected the argument pressed by Southprint that persuasion and threats by a competitor to set up an exclusive contract constituted wrongful means because, the court reasoned, the party threatened "could freely choose to accept or reject them as it wished." <u>Flash Electronics</u>, 312 F. Supp. 2d at 405. The court concluded that threats and persuasion to set up an exclusive distributorship and offers of unprecedented special treatment "do not appear to rise to the level of 'improper means.'" <u>Id.</u> While the court allowed the tortious interference claim to proceed, it did so only because it found that plaintiff stated a viable Sherman Act violation, which provided sufficient wrongful means. Of course, no such antitrust violation is alleged here.

Southprint contends that H3's request for an exclusive supply arrangement with DADA stemmed from the May 10, 2005 call from Hurst to Hammett indicating that AutoZone had selected Marym for the Ford, Chevy and Dodge program, and that the termination of DADA as a source of supply for Southprint was part of McGhee's campaign to undo the AutoZone decision. The problem with this argument, however, is that it is inconsistent with the testimony of its own hat broker, Raul Alvarez, that he was called by Stephen Park of DADA in March or April, 2002 advising that he was getting some pressure from H3 to discontinue production of caps for CFS. (Alvarez Dep. at 27) Alvarez testified that his conversations with Park "to put something in writing as to why he was stopping to do business with - - and those communications and those e-mails took place long before this May 10 date." (Alvarez Dep. at 34) Indeed, Alvarez made it very clear in his deposition that Stephen Park of DADA had made the alternative supply arrangements for Alvarez with Trademax before May 10. (Alvarez Dep. at 32-33) The deposition

14

testimony of Hines of H3 is consistent as to the timing of its demand for exclusivity. (Hines Dep. at 41-42, 95-96)

At the end of the day, therefore, the undisputed evidence establishes that DADA chose to enter into the exclusive supply relationship to preserve its business with H3. Much as in Selman v. American Sports Underwriters, Inc., 697 F. Supp. 225, 242 (W.D. Va. 1988), DADA's choice to keep doing business with H3 in lieu of continuing to sell to Southprint is not actionable. "That plaintiff may have suffered a loss as a consequence of the defendant's pursuit of its own interest is a byproduct of a competitive marketplace; it does not render the defendant's effort tortious." Pembroke Country Club v. Regency Savings Bank, F.S.B., 815 N.E.2d 241, 246 (Mass. App. Ct. 2004).

**B.     There is No Tortious Interference Because Southprint's Supply Relationship Was Not Terminated.**

Regardless whether improper means is required or is supported by the evidence, neither of which is the case, there is another compelling reason for dismissal of the tortious interference claim as regards Southprint's supply relationship with DADA. That is because under the facts of this case, the alleged tortious conduct did not, in fact, sever the de facto supply relationship between DADA and Southprint. Instead, DADA secretly arranged to continue supplying Southprint through Trademax, another trading company set up by DADA to supply hats for Southprint. Although Southprint contends that DADA and Trademax technically are separate entities, and that Southprint's experience with Trademax has been somewhat less convenient causing it to incur substantial air freight charges, the timing and manner in which the Southprint/Trademax supply relationship was established and the efforts made to keep that

15

relationship secret make it clear that Southprint's supply relationship with DADA never really ended.

After DADA advised Alvarez of ProWear that H3 was demanding an exclusive supply arrangement, Southprint's President, Stephen Park, arranged for another trading company to supply Southprint. (Alvarez Dep. at 30-31) In Alvarez' words, "from the beginning when Checkered Flag was pressured to get out of DADA, Stephen Park suggested going to, you know, to another factory, et cetera, et cetera. And he said he would create a – or not create, because the factories existed. So there's two things there. The thing that is new is Trademax was a new trading company that I would be dealing with. The manufacturing facility was already an existing manufacturing facility." (Alvarez Dep. at 30) An e-mail between Southprint and ProWear explains the new supply arrangement:

> [T]he Hong Kong based trading company (Trademax) is wholly owned by same individuals as DADA, but legally set up as a separate Chinese corporation. The bottom line for all involved is that the caps will be manufactured by same standards, but at a factory that DADA was already building under different name.

(See Def. Mot. Summ. J., Exh. 10.)

E-mails between DADA's President, Stephen Park, and ProWear show Trademax was headed by Dave Lim, who was "like a brother" to Park. (See Def. Mot. Summ. J., Exh. 9.) Alvarez testified that DADA's Park made the arrangements for Trademax, was instrumental in its creation and fielded problems with Trademax for Alvarez. (Alvarez Dep. at 31, 62, 96-97) Park indicated that he "will personally guarantee specifications, quality, and service are exactly the same as DADA's" (Def. Mot. Summ. J., Exh. 10, at 1.) The artwork for the hats was to be the same, the financial arrangements were to be the same, and the company even used "DADA's

16

embroidery facilities." Id. at 2. Park's e-mails indicated that DADA created Trademax as an "overseas organization with independent name and ownership, to avoid struggle with international NGO and our buyers' struggle."[6] Id. The goods would be made using the "same materials, made by same persons and facilities." Id.

Although Southprint asserts that its relationship with DADA ended in May, 2002, a later e-mail indicates that a meeting between officials from ProWear, Southprint, Dave Lim of Trademax and Park of DADA occurred in Virginia on October 14, 2002. (Def. Mot. Summ. J., Exh 12) At that time, Raul Alvarez from ProWear met Lim of Trademax and Park of DADA at the Greensboro, North Carolina airport and drove them to Martinsville to meet persons associated with Southprint. (See Alvarez Dep. at 63)

Both from the testimony of Alvarez and Park's e-mails, it is plain that DADA tried to hide from H3 its efforts to set up Trademax as a source of supply for Southprint. (Alvarez Dep. at 66, 74) A May 21, 2002 e-mail between ProWear and Southprint confirms the clandestine nature of Southprint's new source of supply:

> I sent SB Park the message I copied you with. He called me and assured me that he will get the goods delivered and on time. He again assured me that he would guarantee the quality and delivery from Trademax and that he was working on financial arrangements to make it all work. He also told me that Trademax will use new "Sales Contracts" for these goods. He told me that H3 was very suspicious that DADA would make the caps and deliver them under different name so he wants to keep complete arrangement

---

[6]Another e-mail between Park and ProWear indicates that the reason for this method of corporate structure is to avoid pressure from foreign non-governmental organizations ("NGOs"). By operating under different names, DADA could minimize the likelihood that human rights groups could affect operations at headwear factories in several different countries at the same time. (Alvarez Dep. at 61) (Def. Mot. Summ. J., Exh. 11.)

> VERY confidential, and for CFS to declare that caps are being
> made by a reputable source, but not DADA.

(Def. Mot. Summ. J., Exh. 12)  Later, Park expressed concern in another e-mail to Alvarez that

"H3's lawyer proved Trademax and the others are same as DADA."  (Def Mot. Summ. J.,

Exh. 17)

This evidence compels the conclusion that H3's demand that DADA become its exclusive

supplier did not cause the termination of DADA's supply relationship with Southprint.  It

continued under disguise, albeit a thin one.  Southprint's inability to prove that its supply

relationship was severed by any tortious conduct of H3 is a further reason for the

recommendation that its claim for interference with DADA be dismissed.

## IV. H3'S ALLEGATIONS CONCERNING SOUTHPRINT'S CUSTOMERS

Southprint alleges that H3 violated the Lanham Act (Count I), defamed its business

(Count II), and tortiously interfered with its business expectancy (Count IV) by statements made

to two of its customers as to its ability to fulfill its contracts with them.  Having reviewed these

claims in light of H3's motion for summary judgment and relevant case law, it is the

recommendation of the undersigned that H3's motion for summary judgment be granted.

Whether couched as tortious interference, defamation or a Lanham Act violation,

Southprint's claims revolve around the same factual core.  Southprint contends that an H3 sales

representative, Michael McGhee, made certain statements to two of its customers, AutoZone and

CSK, questioning Southprint's source of supply, financial backing and licensing arrangements.

An insurmountable problem with Southprint's claim, however, is that the decision makers at

each of those customers testified that the statements were typical of questions asked by salesmen

18

in the industry and did not affect their decisions or relationships with Southprint. As such, these claims are not actionable.

Certainly as to CSK, the absence of any causation and damages is plain. Despite the alleged questions raised about Southprint's source of supply, licensing status and financial strength, CSK continued to do business with Southprint in a manner unaffected by any comments from H3. Southprint cannot identify any interruption in business or other damages to its business with caused by the statements made to CSK. Indeed, CSK's buyer and merchandising manager, Barbara Tolbert, testified that the statements made by McGhee did not influence her decision. (Tolbert Dep. at 58, 84) Tolbert considered the comments made by McGhee to be "typical," "not unusual" information from a competitor and said that "I took it with a grain of salt." (Tolbert Dep. at 60-61) As such, regardless of the legal theory, there can be no actionable claim based on any statements made to CSK.

Likewise, the evidence from the AutoZone executives does not support Southprint's argument that the statements by McGhee had any impact on AutoZone's decision. As detailed below, the AutoZone witnesses testified that the questions raised by McGhee as to Southprint's capabilities were both typical of the industry and had no impact on its decision to award the business to Southprint.

William Edwards, AutoZone Vice President of Merchandising, testified that he and McGhee had three telephone calls in May, 2002 concerning the negotiations following the test program. (Edwards Dep. at 33) In the first conversation, McGhee "expressed his disappointment in not being awarded the business. He requested that I personally get involved and look at the details of what the two vendors were offering. I think it was Michael's opinion

19

that, because of past business relationships with AutoZone, that he may not be – he may not being given his due, and so he asked me if I would just verify that the selection we were making was going to be the best selection for AutoZone." (Edwards Dep. at 31)

In the second conversation a few days later, "there were some recommendations by Michael of things that we consider. And Michael also wanted the opportunity to – he wanted another opportunity to pursue the business from a competitive standpoint." (Edwards Dep. at 32) McGhee's "recommendations" of things for AutoZone to consider form the crux of Southprint's allegations in this case. Edwards testified that McGhee "challenged us to verify that the company we were going to do business with was financially sound. . . . He recommended that we verify that all the appropriate licensing agreements were in place. . . . I think that there was some question about the size of the company that we had selected and whether or not they had the capacity to supply us at the level that we were going to need to be supplied at because of the size of our company." (Edwards Dep. at 33-34) Consistently, Nathan Ferman of Marym testified that he was told of the "questions" being raised about his company's ability to meet AutoZone's needs. (Ferman Dep. at 155-56)

Edwards considered McGhee's questions to be customary for a competing salesman, (Edwards Dep. at 36, 89), and that they had no impact on the final decision on which company to use. (Edwards Dep. at 89) Edwards indicated that the impact of the questions was to remind him "that there are things that we need to look at and things that we need to verify before we enter into a business relationship." (Edwards Dep. at 37)

20

Edwards' third conversation with McGhee was a perfunctory one thanking Edwards for his company's consideration after the negotiations were concluded and Southprint awarded the business. (Edwards Dep. at 36)

William Hull, Senior Product Manager reporting to Edwards in the AutoZone chain of command, testified that he talked with McGhee a couple of times because the product manager responsible for this business, Marilyn Hurst, was new. (Hull Dep. at 13) Hull said that he was sure that he and McGhee discuss the competition, indicating that "[a]ny time that we are taking quotes on business, I can think of very few instances where one vendor does not talk about their competition, in one form or another." (Hull Dep. at 14) Hull described his conversations with McGhee as raising "the typical concerns: Are you sure that they can service all – handle all the business? Is there manufacturing capabilities and sources? Are they sound? The very typical questions that we expect and is part of our due diligence when we're making our vendor selection." (Hull Dep. at 14) As with Edwards, Hull testified that these concerns were part of AutoZone's due diligence process, and that AutoZone's decision as to which vendor to use was not affected by any comments from McGhee. "Comments aren't going to sway us. I mean, we're going to find out – again, we're going to do it based on facts." (Hull Dep. at 46)

Finally, Marilyn Hurst, product manager at AutoZone testified that McGhee made no statements to her about Southprint. (Hurst Dep. 43-48) Hurst testified that Southprint had been selected by her team at AutoZone as vendor on Friday, May 10, 2002, but was asked the following Monday by her team leader, William Hull, to do some additional due diligence, (Hurst Dep. at 46), and "to give the other vendor one more try." (Hurst Dep. at 35) Hurst then contacted both H3 and Southprint and gave them each another chance to bid. (Hurst Dep. at 39)

21

Hurst told Southprint that "they just needed to bid us their best – they had one more chance and they needed to give us their best program that they could." (Hurst Dep. at 87)  After receiving the new proposals from H3 and Southprint, Hurst said that "[w]e went back to the team table, had another meeting, analyzed it again and came up with the best decision," (Hurst Dep. at 39), a process which took about a week to a week and a half.   As a result of that process, Southprint obtained the AutoZone business, albeit at a reduced price.

For his part, H3's McGhee described his initial phone call with Bill Edwards over the weekend of May 10 as follows: Edwards "really didn't know the company, it was Maryman or Miriam Group or something like that.  And that there was a vote, and that the group thought that the other program had a better program.  And I asked: Is there any probability for us to requote this and get a shot?  Have you guys made a final decision?  He said:  No.  We haven't made a final quote.  If you want to requote it, feel free, have it in the office on Monday."  At that time, McGhee testified that he was not aware that Marym was related to CFS or Southprint. (McGhee Dep. at 100) This conversation followed  McGhee's call to Bill Hull of AutoZone on Friday, May 10, after hearing from Marilyn Hurst at which time he was advised by Hull "that Marilyn may be jumping the gun a little bit.  They still haven't made a final decision." (McGhee Dep. at 96)

McGhee conceded that he advised AutoZone that H3 had an exclusive supply arrangement with DADA to differentiate his company from the competition, (McGhee Dep. at 47), but testified that he was not aware that CFS or Southprint had any active contracts with DADA. (McGhee Dep. at 132)

22

McGhee otherwise denied making any derogatory statements about the license status, manufacturing capabilities or financial strength of his competition. (McGhee Dep. at 94-95, 126-27, 131-33) After submitting three bids and supplying additional information on banking references, (McGhee Dep. at 48-49), McGhee was advised by Hull and Hurst that "they were very pleased with the changes we made to the program, but our competitors came back with a better program once again." (McGhee at 100)

Nathan Ferman of Marym testified that he learned from AutoZone that "questions . . . had been raised" by McGhee of H3 and that AutoZone did not live up to the "original handshake agreement." (McGhee Dep. at 135, 138) Ferman testified that in the ten or so days following May 10, various issues were raised with him which "required us to respond with some form of paperwork." (Ferman Dep. at 156) Ferman outlined the issues raised as being "whether we had the capacity to ship, whether we had more than one factory and the ability to fill orders if anything happened to that factory, whether we were financially stable, whether we had a warehouse, whether we would maintain our NASCAR license and/or whether we really had a Ford, Dodge, and Chevy Chrysler license." (Ferman Dep. at 156) Ferman described the essence of the message from AutoZone as follows: "[B]ecause H3 had raised a bunch of issues and was hard pressing on negotiating, that because of fairness, that everything was off the table and it had to be renegotiated." (Ferman Dep. at 152)

Todd Hammett testified on behalf of TASCO, a company serving as a sales representative for Marym on the AutoZone program. (Hammett Dep. at 36) Hammett summarized that "I was told we had earned the business. Then statements were made, requests from AutoZone were asked for, which generated these exhibits that we're talking on now, and we were back working

23

more to our proposal. Two or three weeks later we were told again, you've got the business. Then at a date later we got purchase orders." (Hammett Dep. at 115-16) During this two week period, Hurst asked Hammett for certain information, the gist of which was "where the factories are located, your license standing with Ford, Chevy, Dodge, NASCAR, those type things, what is your relationships with your licensees or licensors, where are your factories located, what is their capacity." (Hammett Dep. at 101-02) Hammett testified that Hurst requested this information because "she was being told that we were – that the vendor we represent, Marym, Checkered Flag, were going to lose their licenses – that is the best I can recollect, but the gist of it was they were going to lose their licenses or they weren't in good standing with their licenses, that they didn't have the capacity in their factories to support AutoZone's needs, that type stuff. I can't remember exactly because it was a phone call that she made to me." (Hammett Dep. at 102)

Southprint contends that the McGhee comments caused AutoZone to require a process of renegotiation and rebid, and that although it still obtained the business, the subsequent bid came at a financial cost to Southprint of roughly $400,000. Although Southprint contends that McGhee's alleged negative comments caused it to lose money by virtue of the rebidding, the testimony of the AutoZone executives is to the contrary. Edwards testified that it was company practice to notify the losing bidder first, because doing so could result in a "more attractive deal to AutoZone." (Edwards Dep., at 68 - 69) Edwards stated that he felt that after the first round of bidding, "there was probably still some money left on the table," and he "challenged the team to make sure that they had done everything they could to get whatever the deal would be that would be in the best interest of AutoZone." (Edwards Dep. at 68) Edwards wanted his team to "[m]ake sure we are getting the best possible price we can get." (Edwards Dep. at 81) Hammett of

24

TASCO confirmed that Hull of AutoZone explained to him that the additional information was requested by AutoZone as due diligence to make sure it got the best program it could, (Hammett Dep. at 119), and that the price was renegotiated because it was the AutoZone's buyer's job "to get the best pricing that they could," and that Edwards "felt like there may have been something left on the table." (Hammett Dep. at 124) Consistently, Southprint's own contemporaneous e-mails recognized that "AutoZone has come back with a counter offer for the program," and "this is dickering done all the time in the apparel industry after reviewing test results with two or more vendors, to finalize a chain wide program." (E-mail dated May 28, 2002, between Mike Fayles and Mark of Southprint, Docket No. 68, Ex. 24)

After reviewing the evidence, there is no genuine issue of material fact as regards whether the statements made by McGhee of H3 caused any damage to Southprint. Southprint obtained the business of both CSK and AutoZone despite the alleged competitive concerns raised by McGhee, and the value of the AutoZone business stemmed from Edward's desire to require its prospective suppliers to sharpen their pencils and make sure that AutoZone was not leaving any money on the table in the process, as opposed to any comments made by McGhee. (Edwards Dep. at 78-83) While both Edwards and Hull noted that the ultimate negotiations took place after McGhee expressed his competitive concerns about Southprint, neither indicated that McGhee's comments affected AutoZone's decision. (Edwards Dep. at 88-89; Hull Dep. at 46, 77) Indeed, TASCO's Hammett, sales representative for Marym on the AutoZone deal, readily acknowledged that he did not consider Hurst's May 10 phone call to be a commitment on the part of AutoZone. (Hammett Dep. at 116, 176-77) When directly asked if Hurst's call to him on May 10 was "an oral commitment from AutoZone to do business with TASCO, Marym, Checkered

25

Flag," Hammett replied "Commitment's a strong word. I can't say that it's a commitment to do the business until you get a purchase order." (Hammett Dep. at 176-77) Given the fact that both customers involved making the purchasing decision have refuted that McGhee's comments caused them to change their purchasing decision, there is no issue of fact remaining for a jury to decide on the issue of causation and damages on the defamation (Count II), tortious interference with business expectancy (Count IV), or Lanham Act (Count I) claims.

## V. DEFAMATION PER SE CLAIM

Count II of the Complaint alleges business defamation with a broad brush, which Southprint asserts includes defamation per se. The major distinction between this claim and the earlier claims regarding AutoZone and CSK is that Southprint need not make a showing of actual damages if as McGhee's statements were defamatory per se. At common law, defamatory words which were actionable per se included: (1) those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted or punished; (2) those which impute that a person is infected with some contagious disease, where if the charge were true, would subject the person from society; (3) those which impute to a person's unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment; and (4) those which prejudice such person in his or her profession or trade. M. Rosenberg & Sons v. Craft, 182 Va. 512, 29 S.E.2d. 375 (1944).

Southprint contends that every false and unauthorized imputation, spoken, written, or printed which imputes to a business or professional man conduct which tends to injure him in his business or profession is libelous and actionable without allegation or proof of special damages.

James v. Haymes, 160 Va. 253, 168 S.E. 333 (1933). A corporation may be defamed by statements which cast aspersion on its honesty, credit, efficiency, or its prestige or standing in its field of business. See Restatement (Second) of Torts §§ 561, 573. If a plaintiff establishes a claim for defamation per se, Virginia law presumes that the plaintiff suffered actual damages to its reputation, and, therefore, the complaint does not have to present proof of such damages. Fleming v. Moore, 221 Va. 884, 889, 275 S.E.2d 632 (1981).

Although case law defines the applicable category of statements that are defamatory per se as those statements that "impute to a person's unfitness to perform the duties of an office or employment of profit," courts have generally limited this category to those statements where the words contain an imputation that is necessarily harmful in its effects on a plaintiff's business. Compare Badame v. Lampke, 242 N.C. 755, 89 S.E.2d 466 (1995) (holding that where plaintiff alleged that defendant, a business competitor, told a customer that plaintiff had engaged in "shady deals" the words were slander per se, and Chaves v. Johnson, 230 Va. 112, 118, 335 S.E.2d 97, 101 (1985) (holding that statements challenging the level of professional fees and a person's level of experience were not defamatory per se). As the court noted in Chaves,

> In the world of professional competition, statements by competitors that they can undersell others fall on prospective customer's ears like repetitive drumbeats. The most unsophisticated recipient of such a claim, made by one competitor against another, could only regard it as a relative statement of opinion, grounded upon the speaker's obvious bias, and having no tendency to defame.

Id., 230 Va. at 119, 335 S.E.2d at 101.

"[P]ure expressions of opinion, not amounting to 'fighting words,' are protected by the First Amendment of the Constitution of the United States and Article 1, § 12 of the Constitution

27

of Virginia. Id., 230 Va. at 119, 335 S.E.2d at 101-02 (1985). Thus, "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." Yeagle v. Collegiate Times, 255 Va. 293, 295, 497 S.E.2d 136, 137 (1998); accord WJLA-TV v. Levin, 264 Va. 140, 156, 564 S.E.2d 383, 392 (2002); see also Restatement (Second) of Torts § 566 cmt. c (stating that the constitutional difference between fact and opinion "lies in the effect upon the recipient of the communication").

Further, in evaluating claims of defamation, it is appropriate for the court to consider the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement is made. Potomac Valve & Fitting, 829 F.2d 1280, 1287 (4th Cir. 1987). Here, though the precise words of what was actually said is somewhat unclear, the substance of the McGhee phone calls with the AutoZone and CSK executives was to raise questions as to a competitor's ability to meet the buyers' needs. Given the context of the issues raised by H3, they can hardly be considered to be defamatory per se. McGhee thought that H3 was bidding against Marym, and when he learned from Hurst that her team had decided to take the business elsewhere, questioned the AutoZone executives as to whether Marym could meet its needs. The buyers at AutoZone and CSK took these typical competitive comments with a grain of salt and did not base their decisions on them. Indeed, that McGhee's statements had no impact is apparent, as both CSK and AutoZone chose to do business to Marym, acting for Southprint. Given the flux of the competitive bidding process and the observations and response of the ostensible targets of the alleged defamatory statements, the context of this case compels the conclusion that the statements are not defamatory per se.

28

Additionally, H3 argues that there is no evidence that the alleged statements were actually made. Accord Long v. Old Point Bank, 41 Va. Cir. 409, 418 (Norfolk 1997) (sustaining a demurrer based on plaintiff's failure to plead the exact defamatory words used); Warren v. Standard Drug Co., 30 Va. Cir. 355 (same). Specifically, H3 indicates that, excluding in one case, Southprint does not allege with precision the defamatory words used. The complaint asserts that McGhee:

> falsely advised AutoZone that Southprint is financially unstable, has no production capability, only one factory to produce hats and that Southprint had lost that factory and would not deliver the hats AutoZone had contracted to buy. [McGhee] also stated that Southprint was in jeopardy of losing its NASCAR license. [McGhee] falsely told [Marylin Hurst] that "I know for a fact that they [Southprint] do not have a Ford, Chevy and Dodge license."

(Compl. ¶¶ 17-18.)

H3 notes that McGhee categorically denies making these alleged statements. (McGhee Dep. 127-128; 131-133) More importantly, the persons to whom the statements were made deny them as well. (Hurst. Dep. 44-45; 48-49; Tolbert Dep. 72-73) Additionally, Marilyn Hurst denies that McGhee ever made the alleged defamatory statements to her, including the "I know for a fact" language in quotations in the complaint. (Hurst Dep. 43-49)

Southprint's defamation claim thus contains an additional infirmity. Without having proof of what exactly was said, there is no way for the court to determine whether the involved statements were of the sort that could be defamatory. This cause of action was razor-thin as pled, and the deposition testimony simply does not support the allegations in paragraphs 17 and 18 of the complaint as to the precise words used. At most, the depositions of AutoZone's Hull and Edwards establish that McGhee raised questions with them as to whether AutoZone was sure that

29

the competition could meet its needs under the program being bid.[7] After some further due diligence, AutoZone determined that Southprint could meet its needs and, following additional price negotiation, awarded it the business. Given the response by AutoZone and CSK, the questions raised by McGhee as to his competitor's capabilities hardly constitutes defamation per se. McGhee's questions were neither inherently shocking – they are universally described in the depositions by AutoZone and CSK as being routine; and were not the cause of the injury Southprint allegedly suffered.

If the statements made by H3 are defamatory per se, then every party that competes for a contract and loses necessarily has the right to compete again in the courts. Whatever was said – which is not clear given what Southprint has pled – seems to have been nothing more than vigorous competition between two parties seeking business. As such, it is the recommendation of the undersigned that H3's motion for summary judgment regarding the defamation per se count be granted.

## V. CONCLUSION

For the reasons outlined above, it is the recommendation of the undersigned that H3's motion for summary judgment be granted in its entirety and this case dismissed. The Clerk is directed immediately to transmit the record in this case to the Hon. Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any

---

[7]As to the lone affirmative statement allegedly made by McGhee to Hurst, and later relayed by her to Ferman, that McGhee "knew for a fact that they [Southprint] do not have a Ford, Chevy and Dodge license," (Compl.¶ 18), it is difficult to see how that statement is even admissible in evidence as Hurst denies that it was ever said to her. (Hurst Dep. at 48-49) It is hearsay within hearsay, for which no apparent exception applies. See Fed. R. Evid. 801-805.

30

adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(c) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.

Enter this _29th_ day of July, 2005.

Michael F. Urbanski
United States Magistrate Judge